FOR PUBLICATION

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| PAUL C. BOLIN, *Petitioner-Appellant*, | No. 16-99009 |
| v. | D.C. No. 1:99-cv-05279-LJO-SAB |
| RONALD DAVIS, Warden, San Quentin State Prison, *Respondent-Appellee*. | OPINION |

Appeal from the United States District Court
for the Eastern District of California
Lawrence J. O'Neill, District Judge, Presiding

Argued and Submitted June 2, 2021
Pasadena, California

Filed September 15, 2021

Before:  M. Margaret McKeown, Jacqueline H. Nguyen,
and Daniel A. Bress, Circuit Judges.

Opinion by Judge Bress

## SUMMARY[*]

### Habeas Corpus / Death Penalty

The panel affirmed the district court's denial of California state prisoner Paul Bolin's habeas corpus petition challenging his jury conviction for two counts of first-degree murder and his capital sentence.

Applying the deferential standards of review in the Antiterrorism and Effective Death Penalty Act, the panel held that the district court properly denied Bolin's claims that his trial counsel was ineffective in not renewing a motion to change venue based on pretrial publicity and in failing to develop additional mitigating evidence.

The panel held that Bolin did not show that the California Supreme Court's denial of his claim that his trial counsel was ineffective in failing to renew the change of venue motion after jury selection was an unreasonable application of *Strickland v. Washington*. The panel held that reasonable jurists could conclude that Bolin could not overcome the strong presumption that his counsel acted reasonably and appropriately in failing to renew the motion based on pretrial publicity, including episodes of *America's Most Wanted*. Bolin did not show that it would be objectively unreasonable for the state court to conclude that counsel could, as a matter of strategy, forego a likely quixotic change of venue motion in exchange for trying to secure a jury that would be more favorable to Bolin.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

In connection with Bolin's claim that his counsel acted ineffectively in not seeking a further continuance to develop additional mitigating evidence for the penalty phase, the panel granted Bolin's request to expend the certificate of appealability to include the entirety of his claim of ineffective assistance in counsel's failure to investigate and prepare for the penalty phase. The panel held that Bolin was not entitled to relief under *Strickland* for counsel's investigation and presentation of mitigating evidence at the penalty phase or for counsel's related determination not to seek a further continuance. Assuming without deciding that counsel's performance was constitutionally defective, the panel held that Bolin could not show prejudice under AEDPA's deferential standard of review. That is, a fairminded jurist could reasonably conclude that the further investigation and presentation of mitigating evidence Bolin claimed should have occurred was not substantially likely to change the outcome. The panel concluded that the mitigating evidence that Bolin claimed his counsel should have discovered and presented was either cumulative of other evidence that counsel did present, or was inconclusive and insufficiently compelling. Further, a reasonable jurist could also conclude that the new mitigating evidence did not overcome the serious aggravating factors associated with Bolin's crimes and his history of violent criminal conduct.

## COUNSEL

Robert D. Bacon (argued), Oakland, California; Heather E. Williams, Federal Defender; Brian Abbington, Assistant Federal Defender; Office of the Federal Public Defender, Sacramento, California; for Petitioner-Appellant.

Rachelle A. Newcomb (argued) and Sean M. McCoy, Deputy Attorneys General; Michael P. Farrell, Senior Assistant Attorney General; Office of the Attorney General, Sacramento, California; for Respondent-Appellee.

---

## OPINION

BRESS, Circuit Judge:

A California jury convicted Paul Bolin of two counts of first-degree murder and he was sentenced to death. Bolin now seeks federal habeas relief, arguing that his trial counsel was ineffective in not renewing a motion to change venue and in failing to develop additional mitigating evidence. Applying the deferential standards of review in the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), we hold that Bolin is not entitled to relief.

I

A

On Labor Day weekend in 1989, Paul Bolin shot three men, killing two of them. Bolin killed one man as he pleaded for his life in the fetal position. He shot the other man's motionless body with a second firearm and staged the scene to make the murders look like a drug deal gone bad. When his third victim escaped, Bolin disabled the man's truck and left him to die in a secluded area of the Sierra Nevada foothills. Given the testimony of two eyewitnesses, the events were not in significant dispute. We now summarize the facts based on the record before us and the California Supreme Court's decision on Bolin's direct appeal. *See People v. Bolin*, 956 P.2d 374 (Cal. 1998).

In 1989, Bolin was living in a cabin in a remote, mountainous part of Walker Basin in Kern County, California. Vance Huffstuttler lived on the property in a trailer and assisted Bolin in growing marijuana there. Steve Mincy and Jim Wilson were spending their Labor Day weekend with family and friends at a campsite that Mincy's father owned in the vicinity. On the Saturday, Mincy and Wilson went to a local bar and were drinking there with a group of people that included Huffstuttler and Bolin. Sometime after Bolin returned to his cabin, Wilson agreed to drive Huffstuttler back to his trailer. Mincy went along for the ride. Tragically, that decision would prove fateful.

When the trio arrived at the cabin, they saw Bolin there with his friend Eloy Ramirez. Huffstuttler took Wilson and Mincy across a creek bed by the cabin to show them a patch of marijuana plants he and Bolin were cultivating. Bolin then became agitated. He followed the three men across the creek bed and confronted Huffstuttler about bringing outsiders to see the marijuana grow operation.

According to Wilson, who testified at Bolin's trial, Bolin and Huffstuttler crossed back over to the other side of the creek bed, heading toward the cabin and leaving Wilson's view. Then Wilson heard a gunshot from that direction. A moment later, Bolin "came out from behind the tree line with a gun [a revolver] in his hand." He "started apologizing to" Wilson and Mincy, and said, "I have got nothing against you guys, . . . but." When Bolin said "but," Wilson turned and ran. As he turned, Bolin shot him in the shoulder. Wilson ducked behind a tree.

From behind the tree, Wilson heard Bolin shoot Mincy. Wilson could hear Mincy pleading with Bolin, saying, "no, please don't. You don't have to do this. Please don't."

Wilson then heard several more gunshots ring out. Staying hidden behind trees, Wilson ran away up and over a hill.

Ramirez confirmed Wilson's testimony and provided additional details for the jury. Ramirez testified that once Wilson had fled, Bolin retrieved a rifle he kept by his bed. Using the rifle, Bolin shot Huffstuttler's inert body several times as he lay collapsed on the ground. Then, Bolin searched for Wilson after he escaped wounded into the forest; when he could not find him, Bolin commented to Ramirez that Wilson "would bleed to death" before he got off the hill.

After shooting Huffstuttler and Mincy, Bolin told Ramirez that he was going to make the scene "look like a bad dope deal." Bolin broke bottles and poured both marijuana and what Ramirez thought was chili on the dead bodies. Bolin placed the revolver in Huffstuttler's dead hand. Bolin also disabled Wilson's truck by removing wires and throwing them in a gully. Bolin and Ramirez then fled for southern California.

Later analysis revealed that Mincy was shot four times, once while he was upright and three more times while he was in the fetal position lying in the creek bed. Huffstuttler was also shot four times. Wilson, who had traveled all night through the remote, mountainous area, managed to survive after finding refuge in a nearby ranch.

Law enforcement found Ramirez at his girlfriend's house in southern California shortly after the killings. But they were unable to find Bolin for several months. Finally, after the television program *America's Most Wanted* featured a reenactment of Bolin's murders, one of Bolin's family members alerted the police that Bolin was staying in Chicago. That led to Bolin's arrest.

As discussed further below, Bolin had a history of violent crime. In addition to domestic violence incidents during the 1970s, in 1983 a California jury convicted Bolin of attempted voluntary manslaughter for shooting his goddaughter's then-boyfriend, Kenneth Ross, in the chest. Bolin was sent to state prison and paroled in May 1985. In January 1986, Bolin was arrested in Oklahoma for stabbing Jack Baxter. A jury acquitted Bolin based on Bolin's claim of self-defense, but California still revoked his parole. Bolin was released from prison in March 1987.

Then, on September 2, 1989, Bolin murdered Huffstuttler and Mincy. Since shooting Ross in 1981, up until the day he murdered Huffstuttler and Mincy in 1989, Bolin was out of custody for less than forty months.

B

Bolin was charged in Kern County Superior Court with two counts of first-degree murder, one count of attempted murder, and cultivation of marijuana. Bolin was eligible for the death penalty because the state tried him for multiple murders. *See* Cal. Penal Code § 190.2(a)(3).

The state trial court appointed Charles Soria as Bolin's lead counsel and William Cater as second chair. Soria and Cater were both experienced attorneys. Soria had worked as a criminal defense lawyer in Kern County for almost a decade, and in that time he served as counsel in approximately fifteen murder cases, three of which were capital cases. Cater had served in the local public defender's office and defended "lots of cases" before entering private practice. He had also tried two other capital cases. Cater was familiar with the California Death Penalty Defense Manual, and he had attended the Capital Case Defense Seminar at least twice.

Defense counsel initially filed a motion to change venue due to allegedly prejudicial pretrial publicity. This motion was largely based on the *America's Most Wanted* reenactment. The trial court reserved judgment on the motion to see how this issue came up in voir dire of potential jurors. Following jury selection, defense counsel did not renew the change of venue motion. This issue is the basis for one of Bolin's claims of ineffective assistance of counsel, and we provide more background on it below.

On December 12, 1990, the jury found Bolin guilty on all charges. The following day, after the guilt phase closed, Bolin expressed unhappiness with his lead counsel, Soria. The trial judge granted Bolin's request to remove Soria under *People v. Marsden*, 465 P.2d 44 (Cal. 1970), based on a breakdown in the attorney-client relationship. With Bolin's agreement and at his request, the trial judge appointed Cater to handle the penalty phase.

On December 14, 1990, the judge granted a continuance until January 7, 1991 to give Cater more time to prepare Bolin's penalty phase defense. On January 7, 1991, Cater requested and received another two-week extension. The penalty phase began on January 22, 1991. The jury in the penalty phase was the same jury that had convicted Bolin during the guilt phase.

The jury returned a death verdict on January 24, 1991. We discuss at greater length below Cater's investigation into Bolin's mitigating circumstances and his presentation of mitigating evidence, which forms the basis for Bolin's other ineffective assistance of counsel claim.

The California Supreme Court affirmed Bolin's convictions and sentence on direct appeal. *Bolin*, 956 P.2d

at 348. The United States Supreme Court then denied certiorari. *Bolin v. California*, 526 U.S. 1006 (1999) (mem.).

C

Bolin filed state and federal habeas petitions on August 8, 2000. His federal habeas petition was held in abeyance through completion of his state habeas proceedings. In his state habeas petition, Bolin asserted numerous claims, including the two ineffective assistance claims now before us.

In his state habeas proceedings, Bolin did not submit declarations from trial counsel, nor did he submit a declaration on his own behalf. But he did come forward with some additional evidence, including: a declaration from Dr. Zakee Matthews, M.D., a psychiatrist who evaluated Bolin in 1999 and 2000; a declaration from Dr. Natasha Khazanov, Ph.D., a clinical psychologist who evaluated Bolin in 2000; the pretrial report of Dr. Ronald Markman, M.D., a forensic psychiatrist who evaluated Bolin in 1990; reports from Roger Ruby, Bolin's investigator for the penalty phase; declarations from family members and a friend; and a letter Bolin sent to Jerry Halfacre, Bolin's daughter's former boyfriend. The California Supreme Court summarily denied Bolin's state habeas petition "on the merits."

Bolin then filed an amended federal habeas petition. In support, Bolin included 51 exhibits that he had used to support his state habeas petition. Bolin also requested an evidentiary hearing on numerous claims. On April 27, 2012, the district court granted a hearing on Claim C2, regarding Bolin's counsel not renewing the change of venue motion based on pretrial publicity. The district court held the evidentiary hearing on May 14, 2013.

On June 9, 2016, the district court denied all of Bolin's claims, most of which are not at issue here, in a 305-page ruling. The district court issued a certificate of appealability on four claims:

> Claim C2: whether trial counsel was ineffective for failing to renew the change of venue motion following voir dire of the jury.
>
> Claim I13: whether trial counsel was ineffective because of irregularities and improprieties that occurred during the jury's view of the crime scene and related locations.
>
> Claim L (L1–L4): whether the jury view of the crime scene violated [Bolin's] state and federal rights.
>
> Claim W2: whether trial counsel was ineffective by failing to move for a further continuance at the penalty phase.

In this court, Bolin presses only two of the four certified claims—Claims C2 and W2.[1] He does not argue Claims I13 and L, thus abandoning them. *See, e.g.*, *Styers v. Schriro*, 547 F.3d 1026, 1028 n.3 (9th Cir. 2008) (per curiam). Bolin also seeks a certificate of appealability on two additional claims.

---

[1] For ease of reference, we will use the claim numbering and lettering conventions used in the district court.

II

We review a district court's denial of a 28 U.S.C. § 2254 petition de novo. *Cain v. Chappell*, 870 F.3d 1003, 1012 (9th Cir. 2017).

Bolin claims that his counsel violated his Sixth Amendment rights by providing ineffective assistance. The Supreme Court's decision in *Strickland v. Washington*, 466 U.S. 668 (1984), provides the established federal law governing ineffective assistance of counsel claims. To prevail on such a claim, a petitioner needs to "show both that his counsel provided deficient assistance and that there was prejudice as a result." *Harrington v. Richter*, 562 U.S. 86, 104 (2011).

Under *Strickland*'s performance prong, "[a] convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Strickland*, 466 U.S. at 690. We "must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Id.* We evaluate whether "counsel's representation fell below an objective standard of reasonableness." *Richter*, 562 U.S. at 104 (quoting *Strickland*, 466 U.S. at 688). "Representation is constitutionally ineffective only if it 'so undermined the proper functioning of the adversarial process' that the defendant was denied a fair trial." *Id.* at 110 (quoting *Strickland*, 466 U.S. at 686).

In evaluating counsel's performance after the fact, we must also be careful to "apply the strong presumption of competence that *Strickland* mandates," *Cullen v. Pinholster*, 563 U.S. 170, 196 (2011), namely, that "counsel's conduct

falls within the wide range of reasonable professional assistance," *Strickland*, 466 U.S. at 689.  We are required not only to give Bolin's attorneys the benefit of the doubt, but to consider the possible reasons they may have had for their decisions.  *See Pinholster*, 563 U.S. at 196.  *Strickland* applies to counsel's decisions in the penalty phase of a capital case.  "Under *Strickland*, 'counsel has a duty to make reasonable investigations *or* to make a reasonable decision that makes particular investigations unnecessary' during the penalty phase of a trial."  *Carter v. Davis*, 946 F.3d 489, 513 (9th Cir. 2019) (per curiam) (emphasis in original) (quoting *Strickland*, 466 U.S. at 691).

Bolin also bears the burden of showing that counsel's ineffective performance prejudiced him.  To make that showing, Bolin must first demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland*, 466 U.S. at 694.  "In the capital sentencing context, the prejudice inquiry asks 'whether there is a reasonable probability that, absent the errors, the sentencer—including an appellate court, to the extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.'"  *Shinn v. Kayer*, 141 S. Ct. 517, 522–23 (2020) (per curiam) (quoting *Strickland*, 466 U.S. at 695).  This standard is "highly demanding."  *Id.* at 523 (quoting *Kimmelman v. Morrison*, 477 U.S. 365, 382 (1986)).  It requires showing a "'substantial,' not just 'conceivable,' likelihood of a different result."  *Id.* (quoting *Pinholster*, 563 U.S. at 189).

Moreover, Bolin's *Strickland* claims must be evaluated under AEDPA's additionally deferential standard of review because he filed his § 2254 petition after AEDPA's effective

date.  *See, e.g.*, *Woodford v. Garceau*, 538 U.S. 202, 207 (2003).  Although the California Supreme Court's denial of state habeas relief consisted of a summary denial on the merits, that decision must still be reviewed under AEDPA. *See Richter*, 562 U.S. at 98 ("[D]etermining whether a state court's decision resulted from an unreasonable legal or factual conclusion does not require that there be an opinion from the state court explaining the state court's reasoning.").

AEDPA substantially constrains our review of Bolin's claims.  Under AEDPA,

> [a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

This is a challenging standard to meet.  To satisfy AEDPA's "unreasonable application of" prong, a petitioner "must show far more than that the state court's decision was

'merely wrong' or 'even clear error.'" *Kayer*, 141 S. Ct. at 523 (quoting *Virginia v. LeBlanc*, 137 S. Ct. 1726, 1728 (2017) (per curiam)). Instead, "[t]he prisoner must show that the state court's decision is so obviously wrong that its error lies 'beyond any possibility for fairminded disagreement.'" *Id.* (quoting *Richter*, 562 U.S. at 103). That is, the state court's application of clearly established federal law "must be objectively unreasonable." *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003).

When, as here, the California Supreme Court did not offer reasoning when denying Bolin's state habeas petition on the merits, "the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." *Richter*, 562 U.S. at 98. In that circumstance, we "must determine what arguments or theories . . . could have supported[] the state court's decision; and then [we] must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." *Id.* at 102.[2]

We will address Bolin's claims in the order in which they arose in the guilt and penalty phases. We thus begin with the motion to change venue. We then turn to Bolin's claim

---

[2] Bolin insists that the California Supreme Court as a matter of state law accepted his allegations as true. But Bolin's reliance on California pleading rules is inapposite, and his description of California law is in any event incomplete. *See Pinholster*, 563 U.S. at 188 n.12 (explaining that while the California Supreme Court "generally assumes the allegations in the petition to be true," it "does not accept wholly conclusory allegations" and "will also 'review the record of the trial . . . to assess the merits of the petitioner's claims'" (quoting *In re Clark*, 855 P.2d 729, 742 (Cal. 1993))).

that his counsel failed to develop and present mitigating evidence.

## III

In Claim C2, Bolin argues that his trial counsel was ineffective in failing to renew a change of venue motion after jury selection. We hold that under AEDPA, Bolin has not shown that the state court's rejection of this claim was an unreasonable application of *Strickland*. We first set forth the relevant factual background for this claim. We then explain why under AEDPA, Bolin is not entitled to relief.

## A

Before voir dire of prospective jurors, Bolin moved for a change of venue based on pretrial publicity that, in Bolin's view, unfairly prejudiced the jury pool in Kern County. Besides his crime being featured on an episode of *America's Most Wanted* and his later arrest being mentioned in a second episode, the local print and television media also had covered the murders. In connection with his venue motion, Bolin submitted videotapes of the *America's Most Wanted* episodes and newspaper clippings. *Bolin*, 956 P.2d at 385. In particular, Bolin argued that the first episode of *America's Most Wanted* included an inflammatory and misleading reenactment of his crimes.

Bolin also submitted in connection with his motion results from a public opinion survey specific to Kern County that his counsel commissioned. *Id.* His counsel "represented that 45 percent of the people responding indicated they had some knowledge of the case due to the media attention," while approximately 20 percent of those respondents said they had seen the *America's Most Wanted* reenactment. *Id.*

The trial judge initially said he was "very, very concerned" about the *America's Most Wanted* program. But the court also stated: "I'm not inclined to grant the motion to change venue." The judge instead "reserve[d] ruling on" the venue motion, indicating that he wanted to see the responses given by potential jurors during voir dire. The court also "ma[d]e it perfectly clear, but for this reenactment on America's Most Wanted, I do not think there are grounds to change the venue." The trial court allowed, however, that it might consider granting requests to strike jurors for cause based on their reactions to the television program.

In conducting voir dire, Bolin's counsel asked jurors a variety of questions to get a sense of how they may react to the evidence, including prospective jurors' likely perspectives on the death penalty and their exposure to the *America's Most Wanted* episodes. Bolin's counsel challenged for cause every juror who had seen the *America's Most Wanted* program. The trial court denied these requests. Bolin's counsel did not use peremptory challenges on every juror who acknowledged having seen the show. Bolin's counsel also did not renew the motion to change venue at the close of voir dire. The trial thus took place in Kern County, where the murders occurred.

On direct appeal, Bolin asserted that counsel was incompetent for failing to renew the change of venue motion. The California Supreme Court rejected this argument because counsel's decision "did not result from ignorance or inadvertence and reflected a reasonable trial strategy." *Bolin*, 956 P.2d at 386. The pretrial publicity, especially from *America's Most Wanted*, "was a critical focus of the voir dire." *Id.* And "[a]lthough many prospective jurors had been exposed to some pretrial publicity, including the segment reenacting the killings, for the most part few

recalled the specifics or had formed a resolute impression of defendant's guilt." *Id.* The court also found it relevant that the impaneled jurors "all gave assurances they would decide the case based solely on the courtroom evidence." *Id.*

The California Supreme Court on direct appeal thus concluded that "counsel could well have recognized the effect of the publicity had not been as substantial as feared, especially after an 11-month interim." *Id.* at 386–87. This made renewing the venue motion "futile" because the trial court had indicated a willingness to reconsider its tentative denial of the motion only on a showing that an impartial jury could not be seated. *Id.* at 387. Bolin then reasserted this ineffective assistance claim again in his state and federal habeas petitions.[3]

B

The California Supreme Court's rejection of Bolin's ineffective assistance Claim C2 was not objectively unreasonable. Instead, fairminded jurists could conclude that Bolin's counsel was not deficient.

---

[3] The district court held an evidentiary hearing on Claim C2, which included testimony from Cater and Soria. In *Pinholster*, however, the Supreme Court clarified that "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." 563 U.S. at 181. In other words, "evidence later introduced in federal court is irrelevant to § 2254(d)(1) review." *Id.* at 184; *see also id.* at 203 n.20 ("We are barred from considering the evidence Pinholster submitted in the District Court that he contends additionally supports his claim."). We thus limit our discussion to the record before the state habeas court. We note, however, that the result would be the same even if we were to consider the additional evidence developed in connection with the federal evidentiary hearing.

Under *Strickland*'s performance prong, "counsel should be 'strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'" *Pinholster*, 563 U.S. at 189 (quoting *Strickland*, 466 U.S. at 690). This means that "[e]ven under *de novo* review, the standard for judging counsel's representation is a most deferential one." *Richter*, 562 U.S. at 105. But with AEDPA's overlay, our review is even more forgiving: "[t]he standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Id.* (citations omitted) (first quoting *Strickland*, 466 U.S. at 689; and then quoting *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)).

In this case, reasonable jurists could conclude that Bolin cannot overcome the strong presumption that his counsel acted reasonably and appropriately in not renewing the change of venue motion. That is because counsel could have concluded that the motion stood little chance of success and that using peremptory strikes on jurors only to support this likely futile motion would result in striking jurors potentially favorable to Bolin.

In evaluating change of venue motions, California courts consider "the gravity and nature of the crime or crimes, the extent and nature of the pretrial publicity, the size and nature of the community, the status of the victim, the status of the accused, and any indication from the voir dire of prospective and actual jurors that the publicity did in fact have a prejudicial effect." *People v. Coleman*, 768 P.2d 32, 41–42 (Cal. 1989). Even before the trial court's skeptical comments on the motion to change venue, Bolin faced an uphill battle under the governing legal standards.

Although the crimes were sensational, there is no indication Bolin or the victims were well-known in the

community. Kern County's size, perhaps the most important factor in California's change of venue cases, also weighed heavily against Bolin. *See People v. Balderas*, 711 P.2d 480, 497–98 (Cal. 1985) ("Kern County, with a 1981 population of 405,600, ranked 14th among California's 58 counties in that respect. Cases in which venue changes were granted or ordered on review have usually involved counties with much smaller populations." (citation omitted)). In addition, the *America's Most Wanted* broadcast was some time in the past by the time of jury selection. *See Coleman*, 768 P.2d at 43 ("The publicity did not pervade the proceedings so as to give rise to any inference or presumption of prejudice.").

Bolin's counsel also could have taken cues from the trial court when it initially reserved ruling on the change of venue motion. Although the trial court had expressed concern about the *America's Most Wanted* episodes, it also indicated it was not inclined to grant the motion. The court wanted to see how potential jurors responded to the issue in voir dire, while making clear that the television show was the only possible basis for changing venue.

But voir dire all but confirmed that any renewed venue motion would fail. Compared to the survey results counsel had commissioned, a similar percentage of jurors at voir dire indicated they had seen or believed they may have seen the *America's Most Wanted* program. But voir dire revealed that those respondents did not necessarily remember much, if anything, of the program a year later. Jurors also gave credible assurances that they would decide the case based only on the evidence presented in court, not based on the reenactment. Having observed the voir dire, the trial court denied defense counsel's for-cause challenges to jurors that were based solely on jurors having acknowledged seeing the *America's Most Wanted* episode. As the district court

reasoned, "it is unlikely that a trial judge who may have just denied a challenge to a juror for cause based on prejudice stemming from publicity will grant a motion to change venue a short time later." (quoting Jeffrey G. Adachi et al., *California Criminal Law Procedure and Practice* § 15.17 (2013)).

Renewing the change of venue motion also carried considerable risks as well. Under California law, counsel's failure to exhaust all their peremptory challenges is at the very least a "significant" factor supporting the denial of a renewed motion to change venue. *Coleman*, 768 P.2d at 43–44; *see also People v. Sommerhalder*, 508 P.2d 289, 297–98 (Cal. 1973). Without having exercised all available peremptory challenges, the change of venue motion, if renewed, would have had a limited prospect of success. But using all of Bolin's peremptory challenges would have meant striking jurors that counsel thought could be favorable to Bolin, including jurors perceived as less likely to vote for the death penalty. Especially when the venue motion was unlikely to succeed, Bolin's experienced counsel could have decided that knocking out potentially favorable jurors was not a wise strategy. Under AEDPA, Bolin's defense lawyers were not required to pursue a change of venue motion at all costs.

Much of Bolin's briefing has less to do with whether his counsel were constitutionally ineffective by not renewing the motion for a change of venue. Instead, Bolin's opening brief primarily argues that "at the time voir dire began, no meaningful investigation had been undertaken. As a result, trial counsel had no knowledge of Mr. Bolin's life experience and social history upon which to base strategic decisions regarding jurors." Although this argument relates to voir dire, Bolin does not explain how it relates to the

change of venue motion or the *America's Most Wanted* episodes. We explain below why, under AEDPA, Bolin has not shown that counsel's investigation and presentation of mitigating circumstances prejudiced him. To the extent Bolin repackages that argument as support for Claim C2 regarding the change of venue motion, it fails for the reasons we explain below.

In short, Bolin has not shown that it would be objectively unreasonable for the state court to conclude that counsel could, as a matter of strategy, forego a likely quixotic change of venue motion in exchange for trying to secure a jury that would be more favorable to Bolin.

IV

We turn next to Claim W2, that Cater acted ineffectively in not seeking a further continuance to develop additional mitigating evidence for the penalty phase. Within this certified claim, the parties have briefed the broader question of whether trial counsel conducted an inadequate investigation into mitigating circumstances.

In connection with Claim W2, Bolin also asks us to expand the certificate of appealability to include the entirety of Claim W. *See* 28 U.S.C. § 2253(c)(2); Ninth Cir. R. 22-1(d), (e). Claim W consists of counsel's alleged "wholesale failure to investigate and prepare for" the penalty phase. Because of the nature of Claim W2, Bolin's arguments under Claims W and W2 largely overlap. And the State's briefing of Claim W2 is already responsive to Bolin's request for an expanded certificate of appealability on Claim W. We grant Bolin's request to expand the certificate of appealability to include Claim W, to the extent of Bolin addressing Claim W in his opening brief. *See White*

*v. Ryan*, 895 F.3d 641, 645 n.1 (9th Cir. 2018) (citing *Browning v. Baker*, 875 F.3d 444, 471 (9th Cir. 2017)).[4]

We hold that under AEDPA's deferential standard of review, Bolin has not shown he is entitled to relief under *Strickland* for counsel's investigation and presentation of mitigating evidence at the penalty phase or for counsel's related determination not to seek a further continuance. Although we question whether Bolin could make the required showing given Cater's substantial efforts to develop mitigating evidence, we will assume without deciding that Cater's performance was constitutionally deficient (and that under AEDPA, no reasonable jurist could conclude otherwise). Even so, Bolin cannot show prejudice under AEDPA's deferential standard of review. That is, a fairminded jurist could reasonably conclude that the further investigation and presentation of mitigating evidence Bolin claims should have occurred was not substantially likely to

---

[4] Claim W also includes subparts that Bolin has not briefed. For example, Claim W8 relates to alleged ineffectiveness in not objecting to certain penalty phase jury instructions. By not raising these arguments in his opening brief, Bolin has forfeited them. *See Floyd v. Filson*, 949 F.3d 1128, 1138 n.2 (9th Cir.), *cert. denied*, 141 S. Ct. 660 (2020); Ninth Cir. R. 22-1(e).

We also deny Bolin's request to expand the certificate of appealability to include whether we should remand under *Martinez v. Ryan*, 566 U.S. 1 (2012). *Martinez* held that "[i]nadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." *Id.* at 9. Bolin has not demonstrated that *Martinez* is relevant here or that he would be entitled to relief under it. Thus, Bolin has not made a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *see also Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).

change the outcome.  *See, e.g.*, *Kayer*, 141 S. Ct. at 522–23; *Pinholster*, 563 U.S. at 197–98.

To explain this holding, it is necessary first to recount Cater's investigation of mitigating evidence.  Next, we discuss the penalty phase presentations that both sides made to the jury.  We then examine the additional mitigating evidence that Bolin claims his counsel should have discovered and presented.  As we will explain, that mitigating evidence either is cumulative of other evidence that counsel did present, or it is inconclusive and insufficiently compelling.  A reasonable jurist could also conclude that the new mitigating evidence does not overcome the serious aggravating factors associated with Bolin's crimes and his history of violent criminal conduct.

Considered as a whole, the record thus shows that at the very least, under AEDPA, Bolin cannot establish *Strickland* prejudice based on Cater's alleged failure to develop additional mitigating evidence and to seek a further continuance for that purpose.

A

1

We start with Cater's investigation of mitigating evidence.  When the trial judge on December 14, 1990 granted Bolin's motion to have Soria removed as counsel, Cater was appointed lead counsel for the penalty phase.  At that hearing, Cater said that he was "quite familiar with the case, obviously, and somewhat prepared and very much acquainted with the theory of the death penalty presentation," so he thought he could be ready by January 7, 1991.  Thus, the judge granted Cater a continuance of three and a half weeks.  On January 7, 1991, after Cater expressed

dissatisfaction with the investigatory work done by Soria and Soria's investigator, Bruce Binns, Cater requested and received another two-week continuance.

Among the more significant documents that Cater received from Soria was a report from Dr. Ronald Markman, who had conducted a psychiatric evaluation of Bolin at Soria's direction.  Dr. Markman had conducted that evaluation on September 22, 1990, and he sent a written report to Soria on November 12, 1990.

Dr. Markman diagnosed Bolin with polysubstance dependence and a personality disorder with paranoid, explosive, and antisocial features.  But Dr. Markman's "examination revealed [Bolin] to be fully oriented in all spheres, alert, cooperative and of above normal intelligence with an excellent fund of knowledge."  Dr. Markman also wrote that "[t]here was no evidence of a major mental diso[r]der, thought disorder or psychosis, judgment was not impaired and insight into his status was adequate."  The report contains some background life history on Bolin while noting that Bolin was unwilling to provide much information.

Dr. Markman reported that Bolin had "no history of previous psychiatric treatment or hospitalization."  Bolin "admit[ted] to poly-drug abuse 'years ago—you name it,' to include intravenous heroin and cocaine."  He also had "an extended history of daily alcohol use."  Bolin reported to Dr. Markman that he had "consumed a substantial amount of alcohol, both beer and bourbon 'to calm my nerves' and smoked cocaine prior" to killing Huffstuttler and Mincy. Dr. Markman's report also discusses Bolin's "extensive and repeated history of aggressive behavior," including Bolin's prior convictions.

When he spoke with Dr. Markman, Bolin claimed he was injured in Vietnam when his boat was hit by a "rocket." Dr. Markman noted that this claim had "not been corroborated" and that Bolin's claims about his injury and subsequent discharge were "highly unusual." (In a much more detailed account of Bolin's time in Vietnam prepared for the state habeas proceedings, Dr. Matthews did not mention that Bolin was injured in the conflict. Dr. Matthews did report, however, that when Bolin was later stationed in San Diego, he seriously injured his back while working on a ship.)

When it came to other investigative reports and work product, however, Cater determined that the record was lacking. Cater thus undertook substantial efforts to investigate mitigating circumstances that he could raise on Bolin's behalf. Within two days of Cater being appointed as sole counsel, he and Ruby went to interview Bolin in jail. Bolin told them that he had behaved well when he had been incarcerated previously and had received several commendations from the prison for maintenance work he had done.

When Cater requested a two-week continuance at the January 7, 1991 hearing, Cater told the judge that he had made good progress on the investigation. Ruby had "practically closed down his office" and was "working full time" investigating Bolin's life history. By that time, Ruby had already traveled to Oklahoma, Chicago, Arizona, and several places in California to meet with potential witnesses.

Among others, Ruby spoke to Mary and Paula (Bolin's daughters), Pamela Castillo (Bolin's stepdaughter), Fran and Rosemary (Bolin's sisters), and various other relatives, including Gary Monto (cousin), Marilyn Perez (cousin), Trina Perez (Marilyn's daughter), Florence Monto (Gary's

wife), Betty Monto (aunt), Jeremiah Monto (Gary and Florence's son), Sylvester Monto (uncle), and David Alexander (Bolin's probation officer in Oklahoma). After the hearing, Ruby (with Cater) went to southern California as part of the investigation. These various meetings yielded considerable information about Bolin's background and upbringing.

In Chicago in particular, Bolin's sisters and other relatives "gave [Ruby] a wealth of information on [Bolin's] background," and Ruby determined that several relatives would be appropriate witnesses. Ruby learned of the family's claims that Bolin's childhood included physical abuse at the hands of his father William Bolin, and that Bolin spent time bouncing from place to place, including time living on the streets when he was nine or ten years old.

According to Ruby's notes, Bolin's sister Fran told Ruby that when they were growing up, their "father would beat them for nothing." After their parents divorced, Bolin tried living with his father and stepmother. This did not work out because the stepsiblings would blame Bolin for anything they did wrong, and Bolin's father "would then beat Paul until the dad could no longer raise his arms."

Fran did not remember Bolin ever needing to go to a hospital but relayed that one time their father had "hit him and knocked him into the wall," and that Bolin "was out for over an hour from the blow." Bolin "never tried to fight back, he finally just left home and lived from place to place [wherever] he could. Most of the time the grandmother raised him or at least tried to." According to Ruby's notes, Fran said that Bolin "became an orphan on the streets at age 10 and his first ten years were a living hell."

Rosemary, Bolin's other sister, also told Ruby that her father had physically abused the children and their mother. Rosemary claimed that her father once tried to stab her mother in front of the children. She also recalled that her father beat her with a leather strap, and, as a result, she had trouble with her legs as an adult. Rosemary recalled that Bolin "went to the streets at about age 9." He moved from place to place but mostly lived with his grandmother. When he would try to return home, it ended with Bolin being beaten by his father. Ruby concluded, however, that Rosemary likely would not make a good witness because she would "come across to the jury as one that is better than the rest of the family." Rosemary also expressed some unwillingness to attend the proceedings due to her family obligations.

Ruby further learned that Bolin's living situation became more stable when he was fourteen and his mother married his stepfather, Jim. According to Fran, Jim wanted to "put the family back together." The family moved around with some frequency. The family had been living in Salt Lake City for about a year when Bolin joined the military. Fran did not see Bolin much, if at all, until he came to Chicago after the murders.

Other family members in Chicago conveyed to Ruby their positive recollections of Bolin. For example, Marilyn Perez, Bolin's cousin, told Ruby that Bolin loved his family, and that Bolin had helped perform home renovations for her when he was in Chicago (after the murders). Marilyn's daughter Trina discussed Vietnam with Bolin, and he told her that it was a "horr[i]d place and was not a place for any man to have to be."

From Pamela Castillo, Bolin's stepdaughter, and Mary Bolin, Bolin's daughter, Ruby obtained information about

Bolin's role as a protective parent figure. When Mary was five and Bolin was serving in the Navy, Mary's mother began a relationship with another man. She abandoned her two daughters, leaving it to friends and neighbors to care for them. Bolin eventually obtained custody of Mary and Paula. Ruby's notes indicate that he also spoke with Paula as well. Ruby also learned how Bolin allowed Pamela to come and live with him after Pamela's mother left the country for a new relationship.

In southern California, Cater and Ruby talked to more than twice as many people as Binns, Soria's investigator. They found "several important witnesses," and they were evaluating whether to use them.

2

The penalty phase began on January 22, 1991. In addition to emphasizing the murders for which the jury had already convicted Bolin, the State presented evidence of other incidents when Bolin engaged in violent and threatening conduct.

The State first called Kenneth Ross, Bolin's victim on his conviction for attempted voluntary manslaughter, for which Bolin was sentenced to five years in prison. Ross told the jury that in 1981, Bolin shot him in the chest while Ross was having an argument with Bolin's goddaughter, Nyla Olson (now Nyla Ross, Kenneth's wife). Ross testified that the shot Bolin fired "tore up my liver, punctured my diaphra[g]m, front and rear, went through my lung, broke my rib," and that pieces of the bullet were still inside him. Bolin also beat Ross with his rifle after he shot him. As a result of this incident, Ross was hospitalized for several weeks. Nyla Ross also testified, and she confirmed that Kenneth was unarmed when Bolin shot him.

The State then put on Matthew Spencer. Spencer testified that in 1979, he and his friend Brian Martinez went over to Bolin's house at the invitation of "Becky," who was renting a room from Bolin. Bolin became upset at Spencer's presence in the home and assaulted Spencer with help from a friend, Ricky Balsamico. Balsamico beat Spencer with a stick, and Bolin beat him with a pipe. Bolin was not charged for this conduct.

The State also presented evidence that Bolin sent a threatening letter to his daughter Paula's former boyfriend, Jerry Halfacre. In the letter, which Bolin sent while he was awaiting his double-murder trial, Bolin warned Halfacre that if he saw Bolin's daughter again, Bolin would have him "permanently removed from the face of this Earth."

In her closing argument, the prosecutor emphasized Bolin's callousness for his victims, his failure to take responsibility, and his gravitation toward violence. The prosecutor also reminded the jury of the crimes for which Bolin was convicted, reiterating Bolin's heartlessness in the killings, including how he left Wilson to die in the mountains.

3

For the defense presentation at the penalty phase, Cater put on eight witnesses: Mary Bolin (Bolin's daughter), Paula Halfacre (Bolin's other daughter), Pamela Castillo (Bolin's former stepdaughter), Nancy Belden (a correctional officer who had observed Bolin's earlier behavior in prison), Fran Bolin (Bolin's sister), Marilyn Perez (Bolin's cousin), Trina Perez (Marilyn's daughter), and Jeremiah Monto (Bolin's first cousin once removed). Through these witnesses, Cater largely focused on eliciting Bolin's positive attributes and redeeming qualities and how Bolin had helped his family.

But Cater also had witnesses touch on Bolin's difficult upbringing and military service, albeit briefly, and the incidents of other violent crimes that the State had raised in aggravation.

Bolin's daughters, Mary and Paula, testified that Bolin took them in and cared for them as a single father after his first wife abandoned the girls while Bolin was serving in the Navy. Pamela Castillo, Bolin's stepdaughter, similarly told the jury how Bolin had allowed her to live with him after her mother left the country, even though Bolin and Pamela's mother were no longer married by that point. Pamela recalled how Bolin provided food, shelter, and money for the household, and how he also allowed Pamela's friend, Nyla Olson (later Nyla Ross), to live at the home too. Paula and Pamela both noted Bolin's positive relationships with their own children.

Bolin's daughters filled in other details about Bolin's life. Paula explained the circumstances of Bolin coming to live in his remote mountain cabin, testifying that Bolin had relocated there after Bolin's fiancée, Rhonda, died in a car accident. Mary testified about her father's service in the Navy, including in Vietnam.

Mary Bolin was the only defense witness to testify about the Spencer and Ross incidents. She claimed that Bolin was not the one to strike Spencer and that Bolin was trying to protect her because Spencer was trying to touch her inappropriately and was using drugs in the house. As to the Ross shooting, Mary testified that Kenneth Ross was acting violently toward Nyla and was carrying a stick as a weapon. (The prosecution later cross-examined Mary based on inconsistencies between her accounts of the incidents and the police reports.)

Bolin's sister Fran, who is four years younger than Bolin, testified as well. Cater did not ask Fran about the physical abuse she had recounted to Ruby. Fran did, however, tell the jury some of Bolin's life story. When their parents divorced (Fran was then four or five years old, and Bolin eight or nine), Fran went to live with their grandmother, but Bolin stayed with their father, William Bolin. Fran testified about the difficult relationships Bolin had with both William and Bolin's first stepfather. She also spoke about the general hardship Bolin endured during his childhood, recalling that Bolin sometimes "lived with his friends on the street, in cars."

Fran and other Chicago relatives also emphasized Bolin's good character, telling the jury how, after Bolin returned to Chicago following the murders, he tried to get family members to spend time together, took the lead on home renovation projects, and served as a mentor figure to younger family members. Nancy Belden, a correctional officer assigned to Bolin's housing unit while he was incarcerated for shooting Kenneth Ross, recalled Bolin as a "cooperative inmate" and was unaware of him having caused problems in prison.

In his closing argument, Cater argued that Bolin should be sentenced to life in prison. Cater focused on Bolin's positive attributes, including his military service and how he provided for Mary, Paula, and Pamela after their mothers abandoned them: "This is not a man whose life is not without redemption. He provided a shelter, he provided food, he provided a home and a father to these children, and this is not a man that has sought out and gone and done things that you have [to] execute[] him for."

B

Bolin's principal claim on appeal is that Cater should have sought more time to develop mitigating evidence and that had he done so, Cater would have discovered new evidence that would have led the jury to sentence Bolin to life in prison instead of death.  Under AEDPA, we are constrained to disagree.  We hold that a reasonable jurist could conclude that a further continuance of the penalty phase, and Cater's discovery and presentation of the additional mitigating evidence Bolin now identifies, was not reasonably likely to have changed the result in Bolin's case.

The reason lies in the "balance of aggravating and mitigating circumstances" that Bolin's case presents. *Strickland*, 466 U.S. at 695; *see also Pinholster*, 563 U.S. at 198 (explaining that courts evaluating *Strickland* prejudice must "reweigh the evidence in aggravation against the totality of available mitigating evidence" (quoting *Wiggins v. Smith*, 539 U.S. 510, 534 (2003)).  The new mitigating evidence that Bolin has developed in connection with his habeas petition is "hardly overwhelming." *Kayer*, 141 S. Ct. at 525 (quoting *Kayer v. Ryan*, 923 F.3d 692, 727 (9th Cir. 2019) (Owens, J., dissenting)).  Although that evidence presents Bolin in a more sympathetic light in some respects, it also suffers from a variety of shortcomings.  At times, it is variously speculative, double-edged, ambiguous, or otherwise unpersuasive.  In other instances, it is cumulative of evidence and mitigation themes that Cater had presented.  Especially when compared to the "undisputedly strong aggravating factor[s]," *id.* (quoting *Kayer*, 923 F.3d at 727 (Owens, J., dissenting)), a reasonable jurist could conclude that the claimed ineffective assistance of counsel during the penalty phase did not prejudice Bolin.

We first address the several areas of allegedly undeveloped mitigating evidence that Bolin identifies. We explain why, taken as a whole, they are insufficiently compelling. We then turn to the aggravating factors that the State presented.

1

Bolin argues that his counsel should have investigated and presented evidence that primarily consists of the following: (1) Bolin's possible neurological deficits; (2) his substance abuse prior to the murders; (3) his traumatic childhood; (4) his military service, including his time in Vietnam; (5) his good character, based on Bolin's role as a protective parent and his good behavior in prison; and (6) expert testimony to synthesize his life history. While we must necessarily address each of these areas individually, our ultimate conclusion turns not only on deficiencies within each category of mitigation evidence, but in all the mitigation theories when considered as a collective whole.

*Neurological deficits.* Bolin claims that his counsel failed to inform the jury that Bolin had "neuropsychological dysfunction localized to the frontal lobes" of his brain, which Bolin attributes to "[h]is numerous head injuries, alcohol abuse, and exposure to neurotoxins on a daily basis for fifteen years, including solvents, petroleum products and lead particles." According to Bolin, "[b]ecause his frontal lobes have been damaged, [he] has profound impairments in flexibility (the ability to shift or adapt thinking or behavior to changed circumstances) and the ability to inhibit unwanted responses."

The basis for this theory is the expert declarations of Drs. Khazanov and Matthews. Dr. Khazanov performed a neurological assessment on Bolin and concluded that Bolin

exhibited evidence of brain damage, which Dr. Khazanov attributed to potential head trauma from Bolin's childhood, exposure to neurotoxins from his time in the Navy and his work as a pipefitter and welder, and his excessive consumption of alcohol. Dr. Khazanov opined that because of his brain damage, Bolin is "prone to confabulate and fill in the large gaps in his memory with incorrect information," and is further "unable to adequately plan complex actions, learn from his mistakes, or . . . shift his thinking or behaviors in response to environmental or verbal cues."

In his separate report, Dr. Matthews relied on both Bolin's life history, including childhood trauma and alleged neurotoxin exposure, and Dr. Khazanov's conclusions, to opine that Bolin "is psychiatrically and neuropsychologically impaired," and that "such deficits were causally related to his behavior at the time of the offenses for which he has been sentenced to death." Dr. Matthews echoed Dr. Khazanov's determination that Bolin "has a tendency to confabulate" and that because of his brain damage, "he unintentionally fills in the gaps with misinformation." Dr. Matthews concluded that based on Bolin's impairments, "at the time of the crime [Bolin] became frightened and suddenly perceived great danger to himself in the actions of Vance Huffstuttler, which caused him to believe that he had to defend himself against that danger."

Drs. Khazanov and Matthews conducted their analyses approximately ten years after the murders. And their assessment of Bolin is largely at odds with the conclusions of Dr. Ronald Markman, who evaluated Bolin prior to trial and whose report (which Cater received) concluded that "[t]here was no evidence of a major mental disorder." Even setting these points aside, there are a number of significant

shortcomings in Bolin's neurological deficits theory. We need identify only some of them to show that a reasonable jurist could conclude that this theory lacks support and is thus unlikely to have affected the jury's decision.

As an initial matter, while Dr. Khazanov concluded that Bolin's test results were consistent with brain injury, she acknowledged that Bolin's medications, "underlying depression and anxiety," and possible malingering could affect the results. More importantly, while Drs. Khazanov and Matthews tried to connect Bolin's claimed neurological deficits to childhood trauma and neurotoxin exposure, that connection was speculative, or at least a reasonable jurist could so conclude. *Cf. Leavitt v. Arave*, 646 F.3d 605, 614 (9th Cir. 2011) ("[S]peculative mitigation evidence is not entitled to significant weight.").

Dr. Khazanov suggested that Bolin may have developed brain injuries from his father's abuse. But she based this on several scars on Bolin's head, a "definite indentation" she identified near a scar site, and one incident in which Bolin's father allegedly threw Bolin against a wall. Dr. Matthews similarly asserted that based on "reports that Paul was knocked unconscious by his father's blows on more than one occasion, it is quite likely that [Bolin's] brain was damaged by his injuries." Dr. Matthews further suggested that Bolin "may have experienced neuropsychological damage in utero before he was born." A reasonable jurist could conclude that opinions such as these fail to draw a sufficient causal connection between Bolin's childhood and his later claimed brain damage. *See Bible v. Ryan*, 571 F.3d 860, 871 (9th Cir. 2009).

The same is true of his alleged neurotoxin exposure. Dr. Khazanov opined that Bolin had been exposed to neurotoxins, such as lead paints, solvents, and fuels, which

"may result in organic brain damage." Dr. Matthews similarly tried to connect Bolin's alleged psychological impairments to neurotoxins, including based on his parents working in a Chicago factory where they "were exposed to noxious fumes and vapors." But as was true with possible brain damage from childhood injuries, a reasonable jurist could conclude that the relationship between Bolin's alleged mental deficiencies and his (or his family's) neurotoxin exposure is insufficient—and that it is inconsistent with the lack of any other medical records bearing on this issue.

Finally, a reasonable jurist could conclude that Bolin's neurological deficits theory is of uncertain relevance to the offenses for which he was convicted. Drs. Khazanov and Matthews linked Bolin's brain injuries to his confabulating. But it is unclear how Bolin's confabulation explains his murdering Huffstuttler and Mincy. Similarly, a reasonable jurist (and jury) could well find the opinions of Bolin's medical experts unpersuasive given Bolin's deliberate shooting of three people and his strategic thinking after the murders, when Bolin recreated the scene as a failed drug deal and disabled Wilson's vehicle to prevent his escape. Although Bolin's experts have pointed to possible neurological deficiencies attributable to childhood trauma and environmental exposures, "reasonable jurists could debate the extent to which these factors significantly impaired his ability to appreciate the wrongfulness of his conduct or to conform his conduct to the law at the time of the murder." *Kayer*, 141 S. Ct. at 525.

*Substance abuse at time of murders.* Bolin maintains his counsel should have also argued to the jury that Bolin's "ingestion of alcohol and cocaine before the crime, along with the many stressors in his life, exacerbated the effects of his deficits and made it even more likely that he would act

in response to perceived danger." Once again, Bolin does not demonstrate prejudice under AEDPA.

As an initial matter, it is not self-evident that under the circumstances of this case, the jury would necessarily regard Bolin's alleged contemporaneous substance abuse as mitigating. *See, e.g.*, *Pinholster*, 563 U.S. at 201 (explaining that some mitigating evidence, such as "more serious substance abuse," can be a "two-edged sword" because it might cause the jury to conclude the petitioner is "simply beyond rehabilitation" (quoting *Atkins v. Virginia*, 536 U.S. 304, 321 (2002))); *Wackerly v. Workman*, 580 F.3d 1171, 1178 & n.1 (10th Cir. 2009) (discussing case law "demonstrat[ing] that substance abuse evidence often can have more aggravating than mitigating effect"); *Clisby v. Alabama*, 26 F.3d 1054, 1056 (11th Cir. 1994) ("[M]any lawyers justifiably fear introducing evidence of alcohol and drug use.").

Nor is it apparent that a jury would regard an intoxication theory as mitigating alongside Cater's dominant theory that Bolin was a loving and protective father who cared for others. As the Supreme Court has explained, the prejudicial impact of not presenting certain potentially mitigating evidence is lessened if that evidence would "undercut" a mitigation theory that counsel did present. *Pinholster*, 563 U.S. at 202.

Regardless, the evidence that Bolin was under the influence of drugs and alcohol when he killed Huffstuttler and Mincy is seemingly based only on Bolin's own statements to Drs. Markman and Matthews, the latter some ten years after the fact. A reasonable jurist could thus conclude not only that Bolin's theory of drug and alcohol inducement was not mitigating, but also that it was unsupported.

*Childhood trauma*.  We turn next to Bolin's claim that Cater failed to develop and present evidence about Bolin's traumatic childhood.  The evidence of Bolin's childhood is set forth most comprehensively in Dr. Matthews's expert declaration, which describes, among other things, how Bolin's father William was prone to violent outbursts, including screaming, beating his wife and children, and on one occasion throwing Bolin down the stairs and knocking him unconscious.

We note at the outset that Bolin's arguments notwithstanding, Cater did investigate Bolin's childhood by having Roger Ruby, his investigator, speak with Bolin's sisters, Fran and Rosemary, and other members of Bolin's extended family.  As we discussed above, these interviews yielded information about Bolin's difficult upbringing, including the physical abuse at the hands of his father.  It is thus not clear that a further continuance would have made a material difference in the information Cater was able to obtain.

We also note that though Bolin claims the jury was not told about his childhood, Bolin's sister Fran did shed some light on it in her testimony.  While it was not a dominant theme of Cater's overall presentation, Fran told the jury about how their parents divorced when the children were young and how neither Bolin's father nor his first stepfather wanted him in their homes.  Fran recalled for jurors how Bolin was "thrown out" of the house and how he lived "on the streets."

It is true, of course, that Fran did not testify about her father's physical abuse, which she had disclosed to Ruby during her meeting with him.  We acknowledge that the accounts of Bolin's difficult upbringing are disturbing.  And we do not deny their potential value as a mitigation theory.

It is possible, of course, that Cater may have had a reasonable strategic judgment in avoiding this topic or not dwelling on Bolin's childhood further—an issue we do not decide. Regardless, under AEDPA, we cannot conclude that the state court would be objectively unreasonable in determining that further development of this issue was unlikely to have changed the result.

Based on Ruby's investigation, Bolin's sister Fran offered the most extensive account of Bolin's father's abuse. But Bolin's parents divorced when Bolin was eight or nine years old, and Fran was four years younger than Bolin. The impact of her testimony would thus need to be considered alongside the fact that Fran was only four or five years old when she last lived with Bolin on a regular basis. And while Fran provided Ruby with information about Bolin's father beating Bolin following their parents' divorce, it is not apparent Fran and Bolin lived in the same home at this time. In evaluating the prejudice from Fran not testifying about Bolin's childhood abuse, a reasonable jurist could thus consider that Fran's base of knowledge may have been limited.

And while Bolin's other sister, Rosemary, corroborated some of Fran's account, Rosemary lacked knowledge of the full timeframe, and Ruby otherwise questioned whether she would make a good witness. The prejudice to Bolin of Rosemary not testifying therefore must include the possibility that the jury may have viewed Rosemary unfavorably, as Ruby feared.

Further affecting the potential mitigation value of Bolin's abusive childhood is the fact that William's violent conduct, while deplorable, was not so severe that it resulted in Bolin receiving medical attention. The extent of harm that Bolin experienced as a child makes this case analogous to

other cases involving either comparable or far more egregious childhood abuse where § 2254 relief was nonetheless denied. *See, e.g.*, *Pinholster*, 563 U.S. at 201 (denying relief even though petitioner came forward with additional evidence that he was "beaten with fists, belts, and even wooden boards"); *Apelt v. Ryan*, 878 F.3d 800, 815–16 (9th Cir. 2017) (denying relief despite counsel's failure to present evidence that "Apelt 'came from a family background of gross poverty, alcoholism and violence which included emotional, physical and sexual abuse'"; that Apelt's "abusive," "alcoholic" father "beat his wife and children, including Apelt, with an iron rod"; and that Apelt was sexually assaulted as a child); *Cain v. Chappell*, 870 F.3d 1003, 1021 (9th Cir. 2017) (denying relief even though petitioner endured "severe beatings and punishment" during his childhood, including an "untreated head injury").

William's violent conduct toward Bolin, we also must note, does not rise nearly to the level of Bolin's own depraved and lethal conduct. That as well makes Bolin's difficult upbringing a more uncertain basis for mitigation. *See, e.g.*, *Wong v. Belmontes*, 558 U.S. 15, 21, 27–28 (2009) (per curiam) (explaining that while petitioner endured a "'terrible' childhood" with an "extremely abusive" father, "[i]t is hard to imagine expert testimony and additional facts about [petitioner's] difficult childhood outweighing the facts of [the] murder" for which he received a death sentence (emphasis omitted)); *Benson v. Chappell*, 958 F.3d 801, 833 (9th Cir. 2020) (explaining that evidence of petitioner's childhood sexual abuse "does not explain or justify [his] murder of Laura and her three children"); *Samayoa v. Ayers*, 649 F.3d 919, 929 (9th Cir. 2011) (similar).

Further, a reasonable jurist could also discount the prejudicial value of Bolin's childhood experience based on

the amount of time that had elapsed between Bolin's childhood and his much later murders of Huffstuttler and Mincy. Dr. Matthews, who provided the most extensive account of Bolin's abuse, focuses largely on the period before Bolin's parents divorced, when Bolin was eight or nine years old. And while Bolin allegedly continued to experience beatings after that (even though he was evidently spending less time with his father at this point), by the time Bolin was fourteen he had moved in with his mother and her new husband, James Amsbury (Bolin's second stepfather). Thereafter, according to Dr. Matthews, Bolin's "life changed dramatically" because Amsbury "took both Fran and [Bolin] in as though they were his own" and "did his best to be a father to [Bolin]." Meanwhile, Bolin would not murder Huffstuttler and Mincy until he was 42 years old.

A reasonable jurist could conclude that the substantial gap in time between Bolin's worst childhood experiences and his murders of Huffstuttler and Mincy is another feature of the record that weakens the mitigatory effect of William's abusive conduct. *See, e.g.*, *Callahan v. Campbell*, 427 F.3d 897, 937 (11th Cir. 2005) (holding that when evidence of physical abuse predated crimes by "several decades," its mitigation value was "minimal").

Finally, if Cater had introduced evidence of Bolin's own childhood abuse, it risked opening the door to rebuttal evidence of Bolin's domestic abuse of his wife and children. *See Belmontes*, 558 U.S. at 18–19, 24–26 (recognizing counsel's "grave concerns" that, under "California evidentiary rules," if his mitigation argument "swept too broadly," evidence counsel had succeeded in having excluded "would come in for rebuttal").

The record indicates that Bolin had been arrested for battery of his second wife and for assault with a deadly

weapon and child cruelty toward one of his stepdaughters. When asked about the latter, he told his probation officer, "I whipped my stepdaughter's ass with a belt." Bolin had also been arrested for assault with a deadly weapon involving one of his stepdaughter's teenage friends. As Bolin explained, a boy came at him, so he "kicked the shit out of him." These incidents would have at least provided a counterpoint to Bolin's own history of abuse as a child. And they would have likely dampened the mitigation impact of Cater's central theory that Bolin was unworthy of the death penalty because of how he cared for his family. *See Pinholster*, 563 U.S. at 202.

In short, while Bolin's violent upbringing may be the most compelling mitigation evidence that Cater did not present, a reasonable jurist could conclude that it is not so compelling, in combination with the other mitigating and aggravating factors, to indicate that it could have changed the result in Bolin's case.

*Military service*.   Bolin also argues that Cater should have developed and presented more evidence about Bolin's military service. But contrary to the suggestion that the jury was unaware of this aspect of Bolin's life, Cater during the penalty phase peppered his witness questioning with references to Bolin's service in the Navy and Vietnam. The jury heard from Mary and Frances that Bolin had served in the Navy in Vietnam when Mary was a young child. And Cater repeatedly reminded the jury in his closing argument about Bolin's military service in Vietnam and how Bolin had "served his country."

Although Cater could have presented more detail about the specifics of Bolin's experience in the Navy, it is not apparent that this additional information creates a materially different portrait in mitigation.   Although Bolin now

suggests that his service in Vietnam caused him to develop unidentified mental health problems, including through possible neurotoxin exposure, Bolin's time in Vietnam was short (approximately 6 months).

Bolin does point to some positive reviews from military superiors, his stay in a military hospital for an "anxiety reaction" (prior to going to Vietnam), and the back injury he sustained on a ship after returning from Vietnam. But this further background information does not change our conclusion. We can agree that, like Bolin's military service generally, these additional details may have additional value in mitigation. Nonetheless, a reasonable jurist could conclude that Bolin identifies nothing in his military service that presents a supported and compelling basis from which the jury would have reached a different conclusion in the penalty phase.

That is especially so considering that the more favorable or sympathetic aspects of Bolin's time in the Navy must be considered alongside other more negative aspects, which the State might have used in rebuttal had Cater dwelled on the issue more. *See Belmontes*, 558 U.S. at 26 (courts must consider evidence "that would have been presented had [the petitioner] submitted the additional mitigation evidence"). Among other things, Dr. Matthew's report discusses how Bolin's stepfather pushed Bolin to join the service, hoping the Navy would straighten Bolin out after he was arrested and put on probation for burglary. Once in the Navy, Bolin had further disciplinary problems, including a court martial, for offenses that included intoxication on duty from "chemicals" and alcohol, unauthorized absence, and use of an "unissued identification card." Bolin also had told a Navy psychiatrist that he wanted to "beat up someone" and reportedly showed hostility to others. That Bolin's military

career does not tell a consistently positive story—or even a consistent one—means that a reasonable jurist could determine that more information on Bolin's military service would not have likely changed the jury's decision.

*Good character.*   Bolin argues that Cater should have developed and presented additional evidence of his good character, based on Bolin's role as a protective parent and his positive prison adjustment.   We need not dwell on this point for long.   As we described above, the jury heard considerable testimony about Bolin's role as a protective parent to his daughters and stepdaughters.   Indeed, this was the primary theme of Cater's presentation to the jury. Additional evidence on this point would have been cumulative, and thus unlikely to affect the result.   *See, e.g.*, *Pinholster*, 563 U.S. at 200 (rejecting *Strickland* claim under AEDPA when "[t]he 'new' evidence largely duplicated the mitigation evidence at trial").

A similar point answers Bolin's argument that Cater should have said more about Bolin's ability to adjust to prison life.   Cater had already called as a witness Nancy Belden, a correctional officer, and she told the jury that Bolin was cooperative and did not cause problems in custody, agreeing that he was a "model inmate" while he was incarcerated in 1985.   Cater used that testimony in his closing to argue that Bolin functioned well in a structured environment, lumping in his time in the Navy.   Once again, Bolin has not demonstrated that additional information on his behavior in prison would have altered the result in his case.   *See, e.g.*, *id.*

*Expert testimony.*   Finally, we consider Bolin's argument that Cater should have put on expert testimony to support Bolin's penalty phase defense.   Contrary to Bolin's premise, Cater was not without expert opinion: he had Dr. Markman's

evaluation, which was largely unfavorable. But once again, even assuming Cater was deficient in not consulting further experts and bringing forward expert testimony to synthesize Bolin's life history, we cannot conclude Bolin has shown prejudice under AEDPA on the facts of this case.

Bolin cites no authority suggesting that a defense lawyer's determination not to use an expert witness during the penalty phase constitutes *per se* prejudice under *Strickland*. And we are aware of no such authority either, especially in the AEDPA context. Such a rule would be contrary to counsel's well-established discretion, within the bounds of reasonable professional judgment, as to whether to use experts. *See Richter*, 562 U.S. at 106–07 ("Rare are the situations in which the 'wide latitude counsel must have in making tactical decisions' will be limited to any one technique or approach. . . . Here it would be well within the bounds of a reasonable judicial determination for the state court to conclude that defense counsel could follow a strategy that did not require the use of experts . . . ." (quoting *Strickland*, 466 U.S. at 689)); *Bonin v. Calderon*, 59 F.3d 815, 834 (9th Cir. 1995) ("[T]he presentation of expert testimony is not necessarily an essential ingredient of a reasonably competent defense.").

Instead, we must evaluate Bolin's charge that Cater should have used an expert based on the expert testimony Bolin now proffers and the overall record in this case. For the reasons we have discussed above, the expert testimony that Bolin advanced to the state habeas court—from Drs. Khazanov and Matthews—has limited mitigation value.

Further weakening Bolin's focus on the lack of expert testimony is that if Bolin had offered such testimony, the State could have offered its own expert in rebuttal. *See*

*Pinholster*, 563 U.S. at 201 (psychiatric evidence could have "opened the door to rebuttal by a state expert"); *Belmontes*, 558 U.S. at 25 (explaining that the "'more-evidence-is-better' approach" "might seem appealing" but carried significant risks of rebuttal evidence in response to "heavyhanded" attempts to "portray [the defendant] in a positive light, with or without experts").

We need look no further than Dr. Markman, the expert Bolin's own counsel had retained prior to trial. Dr. Markman evaluated Bolin in 1990, not long after the murders. And his conclusions were not helpful to Bolin's current theory of mental impairment. In particular, and among other things, Dr. Markman opined that Bolin was "fully oriented in all spheres," of "above normal intelligence with an excellent fund of knowledge," with "no evidence of a major mental disorder, thought disorder[,] or psychosis." Dr. Markman also cited Bolin's "repeated history of aggressive behavior" while noting that if Bolin had "fabricated" information he provided to Markman, Bolin was "fully aware that he is doing so."

While Bolin now maintains that Dr. Markman's evaluation was not translatable for penalty phase purposes and that Markman based his opinions on insufficient information, those arguments misunderstand the relevance of Dr. Markman's report for purposes of our present analysis. Dr. Markman's opinions could themselves have had some shortcomings. But they reflect the type of expert opinions that the State could have put on, had Cater put on an expert like Drs. Matthews or Khazanov. That Dr. Markman had evaluated Bolin more contemporaneously with the murders, and was an expert that Bolin's own counsel had retained, only further underscore the State's ability to offer its own expert in rebuttal. It would be

objectively reasonable for the state habeas court to conclude that under the facts of this case, Bolin was not prejudiced by the lack of expert testimony because the prosecution could have presented an opinion similar to Dr. Markman's, which was unhelpful to Bolin.

2

Viewed as a collective whole, the additional mitigating evidence Bolin has brought forward in habeas is not inevitably compelling under AEDPA. This on its own would be sufficient to deny relief under § 2254. *Pinholster*, 563 U.S. at 202. But that conclusion is bolstered when the new mitigating evidence is considered alongside the aggravating circumstances that the State presented.

As the Supreme Court has explained, even before the AEDPA overlay, "to establish prejudice" Bolin "must show a reasonable probability that the jury would have rejected a capital sentence after it weighed the entire body of mitigating evidence . . . against the entire body of aggravating evidence." *Belmontes*, 558 U.S. at 20; *see also Mickey v. Ayers*, 606 F.3d 1223, 1245 (9th Cir. 2010) (explaining that the Supreme Court has "reaffirmed that the facts of the crime play an important role in the prejudice inquiry"). And under AEDPA, Bolin must show even more: that the state habeas court's reweighing of the aggravating and mitigating circumstances was not merely unpersuasive, but "objectively unreasonable." *Andrade*, 538 U.S. at 75. Bolin cannot make this showing.

The crimes that lead to capital convictions often present highly aggravated circumstances. This case is no exception. But if anything, it involves uniquely cruel and unjustified conduct that reflected an appreciable indifference to human life. In an apparent effort to maintain the secrecy of his

marijuana grow operation, Bolin shot two men four times each.  Mincy implored Bolin to spare him, but Bolin killed him anyway.  Bolin took the effort to get a second weapon to use on Huffstuttler's motionless body after he had already shot him once.  And Bolin then elaborately dressed the scene with broken glass, marijuana, and chili, placing a gun in Huffstuttler's dead hand.  Bolin also shot Wilson in the shoulder, hunted for him in the forest, and, when he failed to find him, immobilized Wilson's vehicle and left Wilson to perish in an unforgiving mountainous terrain.  And this is to say nothing of the other past incidents of violent conduct that the State presented involving Kenneth Ross and Matthew Spencer—conduct that resulted in serious injury and, in the case of Ross, could have resulted in death.

Taken as a whole, "[t]he State presented extensive aggravating evidence."  *Pinholster*, 563 U.S. at 198.  A reasonable jurist could easily conclude that the additional mitigating evidence Bolin now proffers was unlikely to have led the jury to choose a different sentence.  We thus hold that even if Cater acted deficiently in failing to develop and present more mitigating evidence and in failing to seek additional time for that endeavor, under AEDPA Bolin cannot show he was prejudiced.

V

Lastly, we address Bolin's request for new counsel.  On two earlier occasions, Bolin filed pro se requests for alternative counsel, and both times we ordered his appointed counsel to respond.  Both times, we concluded that his counsel's response was satisfactory under *Martel v. Clair*, 565 U.S. 648 (2012).  Thus, we denied Bolin's requests.

Since then, Bolin has filed several additional pro se motions requesting alternative counsel and related relief.

We have carefully reviewed those filings as well. We deny Bolin's latest requests. Although Bolin has not prevailed in this appeal, his appointed counsel ably discharged their duties in representing him before this Court.

\* \* \*

The judgment of the district court is **AFFIRMED.**